**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 4, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SORENSON COMMUNICATIONS, INC.
and GOAMERICA, INC.,

      Petitioners,

  v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES OF
AMERICA,

      Respondents.

_____

SORENSON COMMUNICATIONS, INC.
and GOAMERICA, INC.,

      Intervenors-Petitioners.

Nos. 08-9503
     08-9507
     08-9545
     08-9547
     08-9550

---

**PETITION FOR REVIEW OF AN ORDER FROM**
**THE FEDERAL COMMUNICATIONS COMMISSION**
**(Nos. FCC-1:CG 03-123 & FCC-1: FCC 07-186)**

---

Donald B. Verrilli, Jr.[*] (Ian Heath Gershengorn,[**] Michael B. DeSanctis, Ginger D. Anders and Jonathan F. Olin, with him on the briefs), Jenner & Block LLP, Washington, D.C., for Intervenor-Petitioner, Sorenson Communications, Inc.

Karl Buch of Chadbourne & Parke LLP, New York, New York (Dana Frix of Chadbourne & Parke LLP, Washington, D.C., with him on the briefs), for Intervenor-Petitioner, GoAmerica, Inc.

Jacob Lewis, General Counsel, Federal Communication Commission, Washington, D.C. (Deborah A. Garza, Acting Assistant Attorney General; James J. O'Connell, Jr., Deputy Assistant Attorney General; Robert B. Nicholson and Robert J. Wiggers, Attorneys, United States Department of Justice, Washington D.C.; Matthew L. Berry, General Counsel; Joseph R. Palmore, Deputy General Counsel; Daniel M. Armstrong, Associate General Counsel; and C. Grey Pash, Jr., Counsel, Federal Communications Commission, Washington, D.C., on the briefs), for Respondents, Federal Communications Commission and the United States of America.

---

Before **TACHA**, **MURPHY** and **TYMKOVICH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

The Americans with Disabilities Act ("ADA") mandates that individuals with hearing or speech disabilities have access to telecommunications relay services ("TRS"), which are telephone transmission services enabling such

---

[*]Donald B. Verrilli has left the firm of Jenner & Block LLP to enter government service. He was replaced as principal attorney of record for Sorenson Communications, Inc., by Ian Heath Gershengorn as of March 4, 2009.

[**]Ian Heath Gershengorn has left the firm of Jenner & Block LLP to enter government service. He was replaced as counsel for Sorenson Communications, Inc., by Paul M. Smith as of May 21, 2009.

individuals to communicate in a manner functionally equivalent to how individuals without disabilities communicate. 47 U.S.C. § 225(a)(3), (b)(1). Interstate TRS providers are compensated for the costs of providing TRS from a fund (the "TRS Fund") governed by the Federal Communications Commission ("FCC"). 47 C.F.R. § 64.604(c)(5)(iii). In two declaratory rulings, the FCC articulated three restrictions on TRS providers which petitioners challenge in this case. First, the FCC prohibited providers from using revenues received from the TRS Fund to lobby customers. *Telecommunications Relay Servs.* (*2008 Declaratory Ruling*), 23 F.C.C.R. 8993, 8998 (2008). Second, it prohibited providers from using customer data collected in the course of providing TRS for lobbying or any other purpose except the handling of TRS calls. *Id.* at 8997; *Telecommunications Relay Servs.* (*2007 Declaratory Ruling*), 22 F.C.C.R. 20140, 20176 (2007). Third, the FCC prohibited providers from engaging in various marketing practices designed to increase TRS usage. *2008 Declaratory Ruling*, 23 F.C.C.R. at 8998-99; *2007 Declaratory Ruling*, 22 F.C.C.R. at 20173-75.

Sorenson Communications, Inc. ("Sorenson") and GoAmerica, Inc. ("GoAmerica"), two TRS providers, raise statutory and constitutional challenges to these restrictions. Exercising jurisdiction pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1), this court concludes the restriction on using revenue from the TRS Fund for lobbying is arbitrary and capricious because the FCC provided no explanation for why lobbying was singled out for prohibition. This court also

concludes the restriction on the use of customer data violates the First Amendment as an impairment of providers' right to engage in political and commercial speech without any showing the restriction is narrowly tailored to advance a significant government interest. GoAmerica's challenge to the restriction on abusive marketing practices is dismissed under 47 U.S.C. § 405(a) because GoAmerica failed to present its argument to the FCC prior to seeking judicial review.

## II. BACKGROUND

The ADA mandates that individuals with hearing or speech disabilities have access to TRS. 47 U.S.C. § 225(a)(3), (b)(1). Various types of TRS exist. *2007 Declaratory Ruling*, 22 F.C.C.R. at 20141 n.2. One type of TRS is Video Relay Service "("VRS")", which enables a person with a hearing disability to remotely communicate with a hearing person by means of a video link and communications assistant. *Id.* at 20142 n.9. The VRS customer communicates with the communications assistant by sign language, and the communications assistant communicates with the hearing person by voice. *See id.*; 47 C.F.R. § 64.601(a)(26).

TRS customers do not pay the costs associated with the service. 47 U.S.C. § 225(d)(1)(D). Providers of traditional telephone voice transmission service are obligated to make TRS available to persons with hearing and speech disabilities. *Id.* § 225(b). The costs associated with interstate and intrastate TRS are

compensated by way of funds administered by the federal and state governments, respectively.[1]  *Id.* § 225(d)(3)(B).  The TRS Fund is financed by interstate telecommunications providers on the basis of interstate end-user telecommunications revenues.  47 C.F.R. § 64.604(c)(5)(iii)(A).  TRS providers are compensated out of the TRS Fund at a rate determined by the FCC. *Id.* § 64.604(c)(5)(iii)(E).  For VRS, the FCC sets tiered per-minute compensation rates that vary depending on the size of the provider.  *2007 Declaratory Ruling*, 22 F.C.C.R. at 20162-63.  VRS is compensated at a higher rate than most other forms of TRS, and the number of people using VRS has increased in recent years. *Id.* at 20145.  For the 2007-08 Fund year, nearly 75 percent of the TRS Fund was attributable to VRS.  *Id.*

In 2006, the FCC decided to examine whether it should revise its rate structure for TRS.  *Further Notice of Proposed Rulemaking: Telecommunications Relay Servs.*, 21 F.C.C.R. 8379, 8380 (2006).  In its notice of proposed rulemaking, the FCC sought "comment on a broad range of issues concerning the compensation of providers of . . . TRS from the Interstate TRS Fund."  *Id.*  These included "numerous issues relating to the cost recovery methodology used for determining the TRS compensation rates paid by the Fund, as well as the scope of the costs properly compensable under Section 225 and the TRS regime as

---

[1]On an interim basis, providers of intrastate VRS are compensated by the TRS Fund.  *Telecommunications Relay Servs.* (*2007 Declaratory Ruling*), 22 F.C.C.R. 20140, 20144 n.15 (2007).

intended by Congress." *Id.* at 8384. The notice also proposed new methodologies for calculating per-minute compensation rates. *Id.* at 8385.

In the 2007 Declaratory Ruling, the FCC changed how it calculates per-minute compensation rates. *2007 Declaratory Ruling*, 22 F.C.C.R. at 20176. Those changes are not at issue in this appeal. In addition to changing the compensation methodology, the FCC also used the 2007 Declaratory Ruling to clarify issues regarding improper incentives and marketing practices on the part of some TRS providers. *2007 Declaratory Ruling*, 22 F.C.C.R. at 20173. Because customers do not pay for the service, the FCC explained, providers could encourage them to make calls they might not otherwise make. *Id.* at 20173-74. The FCC reminded providers of a 2005 Public Notice regarding impermissible marketing practices. *Id.* at 20174. It went on to note it was still receiving reports of VRS providers offering improper incentives to TRS customers, and it reaffirmed the prohibitions on improper incentives and marketing practices. *Id.* at 20175.

The FCC also declared that providers "may not use a consumer or call database to contact TRS users for lobbying or any other purpose." *Id.* at 20176. It explained that using a customer's profile information to contact the customer was an improper use of such data, and declared that providers could not contact customers to inform them about pending TRS compensation issues. *Id.* The FCC further declared that providers engaging in improper marketing practices or

-6-

misusing customer information would be ineligible for compensation from the Fund. *Id.*

After the 2007 Declaratory Ruling was issued, Sorenson petitioned the FCC to reconsider the prohibition on using customer data to contact customers "for lobbying or any other purpose," arguing the prohibition violated the Administrative Procedures Act ("APA") and the First Amendment. *See 2008 Declaratory Ruling*, 23 F.C.C.R. at 8996. Counsel for Hands On Video Relay Services, Inc.[2] also submitted three *ex parte* letters to the FCC. In those letters, Hands On stated it "supports much of the [2007 Declaratory Ruling], which addresses certain abusive marketing practices, such as . . . contacts made by provider representatives urging VRS consumers to make more calls using a provider's service." The letters went on to list statutory and constitutional concerns with "the portion of the [2007 Declaratory Ruling] which prohibits providers from contacting *for any reason* consumers who have registered with a provider."

In response to the concerns expressed by VRS providers, the FCC issued the 2008 Declaratory Ruling for the purposes of clarification. *Id.* at 8993. In the 2008 Declaratory Ruling, the FCC clarified that the restriction on the use of customer information "for any . . . purpose" does not prohibit contacts directly

---

[2]Hands On Video Relay Services is a wholly owned subsidiary of GoAmerica.

related to the handling of TRS calls. *Id.* at 8997. As examples, it explained providers could contact customers to inform them of a service outage, respond to a call for emergency services, assist in the delivery of emergency services, or provide technical support for TRS products or services. *Id.* It also stated providers could use such data "to comply with a federal statute, a Commission rule or order, a court order, or other lawful authority." *Id.* (quotation omitted).

In the 2008 Declaratory Ruling, the FCC also explained providers were prohibited from using revenue from the TRS Fund to contact customers and attempt to persuade them to support the provider's position on matters pending before the FCC, since the payments from the Fund are only intended to compensate providers for the costs of providing TRS. *Id.* at 8998. Finally, with respect to impermissible financial incentives and marketing practices, the FCC clarified that such practices are prohibited regardless of whether the provider uses customer call data or similar, privately collected information. *Id.* at 8998-99.

Sorenson and GoAmerica filed petitions seeking judicial review of the declaratory rulings. Both challenge the prohibition on using TRS revenues to contact customers for lobbying or advocacy purposes. They both also challenge the prohibition on using customer data to contact customers for lobbying or any purpose other than the handling of relay calls. GoAmerica alone challenges the prohibition on abusive marketing practices. After Sorenson and GoAmerica filed petitions for review of the declaratory rulings and their challenges were

consolidated in this court, a panel of this court granted a stay of enforcement of the challenged portions of the declaratory rulings pending appeal.

## III. DISCUSSION

*A. Restriction on Use of TRS Revenues for Lobbying or Advocacy Purposes*

The various challenges to the FCC's rulings are premised on both statutory and constitutional grounds. It is a "fundamental rule of judicial restraint" for courts, "[p]rior to reaching any constitutional questions, . . . [to] consider nonconstitutional grounds for decision." *Jean v. Nelson*, 472 U.S. 846, 854 (1985) (quotations omitted). This court, therefore, considers petitioners' statutory arguments first.

Sorenson argues the restriction on using TRS Funds to lobby customers is arbitrary, capricious, or contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). The FCC asserts the restriction is a logical action taken to counteract a specific problem. An agency action is arbitrary and capricious under the APA if, *inter alia*, the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). The same standard of review applies to both initial policy decisions and subsequent changes in policy. *F.C.C. v. Fox Television Stations, Inc.*, 129 S.Ct. 1800, 1810-11(2009). Review under the arbitrary and capricious standard is

narrow in scope, but is still a "probing, in-depth review." *Qwest Commc'ns Int'l, Inc. v. F.C.C.*, 398 F.3d 1222, 1229 (10th Cir. 2005) (quotation omitted). An agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). The court must rely upon the reasoning set forth in the administrative record and disregard *post hoc* rationalizations of counsel. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

In the 2008 Declaratory Ruling, the FCC explained providers were not permitted to use revenues from the TRS Fund for "lobbying or advocacy activities" directed at customers because it found "[e]vidence in the record [] that at least one service provider has bombarded deaf persons with material seeking to persuade them to support the provider's position on matters pending before the FCC."[3] *2008 Declaratory Ruling*, 23 F.C.C.R. at 8998 (footnote omitted). According to the FCC, "using revenue from the TRS Fund . . . to engage in that kind of advocacy is inconsistent with the purpose of the TRS Fund." *Id.* The FCC went on to state that "[t]he TRS Fund is designed to ensure that persons with hearing and speech disabilities have access to the telephone system. It was not

---

[3]Although the 2008 Declaratory Ruling referred to the bombardment of customers with lobbying materials, the FCC has not attempted to defend the restriction on lobbying users under a consumer protection rationale. This court, therefore, expresses no opinion on whether such a rationale could support the restriction.

intended to finance lobbying by providers directed at end users. The Commission is under no obligation to fund such activities out of the public fisc." *Id.* (quotation omitted). The rationale for the restriction, therefore, was that lobbying end users was not an activity the TRS Fund was intended to compensate, and therefore monies from the TRS Fund were not permitted to be used for that purpose.

The FCC does not reimburse VRS providers for actual costs. Instead it compensates them based upon a tiered price cap formula. *2007 Declaratory Ruling*, 22 F.C.C.R. at 20160-63. From provider data of expected costs and levels of usage, the FCC sets a per-minute compensation rate for providers. *Id.* One rationale for this approach is to give providers an incentive to innovate and reduce costs. *See id.* at 20162. If a provider can deliver VRS at an actual cost lower than the FCC's estimated cost, it retains the difference. The FCC has noted that in prior years estimated costs generally exceeded actual costs. *Id.* at 20161.

Under this compensation scheme that allows VRS providers to retain payments in excess of actual costs, the FCC singled out lobbying as the one expenditure for which TRS Fund proceeds could not be used. The interdiction of the use of payments from the TRS fund for lobbying was premised on the Fund's limited design "to ensure that persons with hearing and speech disabilities have access to the telephone system." *2008 Declaratory Order*, 23 F.C.C.R. at 8998.

The FCC's justification is inconsistent with the logic of a price cap-based compensation system. The FCC has chosen to reward efficient providers by allowing them to retain the savings generated by providing TRS at a low cost. It does this by compensating providers regardless of their actual costs in providing TRS. This reward mechanism is only effective if providers are permitted to decide how to spend those savings. Regardless of the validity of the FCC's concern regarding the purpose of the TRS Fund, it made no attempt to explain how restricting the use of revenues from the TRS Fund is consistent with its choice of a price cap scheme which itself seeks to reward efficiency and increase market access by allowing providers to retain cost savings.[4]

Under the FCC's broad rationale, *any* expenditure apart from the actual cost of providing TRS is inconsistent with the purpose of the Fund. Lobbying expenditures, however, are the only expenditures prohibited. It is true the FCC is not required to address all problems "in one fell swoop," and may focus on problems depending upon their acuteness. *Nat'l Ass'n of Broadcasters v. F.C.C.*, 740 F.2d 1190, 1207 (D.C. Cir. 1984). Nonetheless, the FCC must still articulate "a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn.*, 463 U.S. at

---

[4]This court need not decide whether the FCC may, under any circumstances, dictate the use of TRS revenues under a price-cap-based compensation scheme. If it is to do so, however, it must provide a satisfactory explanation for its action. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

-12-

43. The FCC made no attempt to explain why lobbying expenditures were deserving of prohibition while all other uses of Fund revenues were not.

Because the FCC's chosen cost recovery system allows providers to spend revenues from the TRS Fund however they choose, the FCC inadequately explained its restriction on the grounds that lobbying expenditures are inconsistent with the purpose of the TRS Fund. *2008 Declaratory Ruling*, 23 F.C.C.R. at 8998. The FCC further failed to provide any reason why lobbying expenses are deserving of prohibition when all other business expenditures are permissible. Absent these justifications, the prohibition on lobbying expenditures is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). The 2008 Declaratory Ruling is hereby **REMANDED** to the FCC for further proceedings consistent with this opinion. Because the restriction is unlawful under the APA, this court does not consider the constitutional challenge.

## B. Restriction on Use of Customer Data

### 1. Notice and Comment Challenge

GoAmerica contends the restriction on the use of customer data constitutes a legislative rule and, as such, was improperly issued without notice and comment. The FCC argues the restriction is an interpretative rule which does not require notice and comment.[5] *See* 5 U.S.C. § 553(b)(A). Under the APA,

---

[5]The FCC does not assert it complied with notice and comment procedures, so if the restriction is a legislative rule, it was improperly issued.

legislative rules can be issued only following notice and comment procedures. *Ballesteros v. Ashcroft*, 452 F.3d 1153, 1158 (10th Cir. 2006), *aff'd in relevant part on reh'g,* 482 F.3d 1205, 1205 (10th Cir. 2007). A rule is legislative when it "has the force of law, and creates new law or imposes new rights or duties." *F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000) (quotation omitted). Interpretative rules, by contrast, "advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995) (quotation omitted). The agency's own label for its action is not dispositive. *Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 939 (D.C. Cir. 1998).

In support of its argument that the restriction on the use of consumer data is an interpretative rule, the FCC points to a prior order (the "2000 Order") where it stated, "[TRS customer] data may not be used for any purpose other than the provision of TRS." *Telecommunications Relay Servs.* (*2000 Order*), 15 F.C.C.R. 5140, 5175 (2000). This was codified as a regulation stating, "[TRS customer] data may not be used for any purpose other than to connect the TRS user with the called parties desired by the TRS user." 47 C.F.R.§ 64.604(c)(7). The FCC argues the 2000 Order and the regulation created the restriction on the use of customer data, and the Declaratory Rulings at issue in this case serve only to remind regulated entities of this obligation. Therefore, the FCC argues, the

restriction on the use of customer data was an interpretative rule, not subject to the APA's notice and comment requirements.

GoAmerica argues the 2000 Order concerned an entirely different issue and context. The relevant portion of the 2000 Order concerned the transfer of customer data during changeovers between providers. *2000 Order*, 15 F.C.C.R. at 5173. In order to minimize disruptions in TRS, outgoing providers were ordered to give customer data to incoming providers. *Id.* at 5175. To protect the privacy expectations of customers, however, the FCC also prohibited providers from using customer profile information for any purpose other than to connect TRS calls. *Id.* According to GoAmerica, the restriction on the use of customer information applies in the narrow context when providers are replaced without the knowledge and consent of customers. The FCC's use of this restriction in the current context is entirely different, GoAmerica argues, and the FCC has conceded the new restrictions were not motivated by privacy concerns. Because the restriction arises in a new context and is meant to achieve a different purpose from the restriction in the 2000 Order, GoAmerica contends it constitutes a new rule for which notice and comment were required.

The regulation at 47 C.F.R. § 64.604(C)(7) restricting the use of customer data came about in the context of transfers between outgoing and incoming providers, but the regulation unambiguously prohibits the use of customer data except to connect TRS calls. The declaratory rulings at issue in this case did not

create any new duties with respect to customer data, but merely informed providers of the FCC's interpretation of the existing regulation. As a consequence, the restriction contained in the declaratory rulings was an interpretative rule, and the FCC was not required to comply with notice and comment procedures.

2. Arbitrary and Capricious Challenge

Sorenson and GoAmerica both argue the restriction on the use of customer data was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A). An agency must provide a rational explanation when it departs from an existing regulation or position. *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002). Sorenson and GoAmerica argue the prohibition on using customer data to contact customers runs directly contrary to prior and ongoing FCC requests for providers to engage in outreach efforts to customers. GoAmerica also argues the prohibition is contrary to the FCC's prior interpretation of the statute requiring TRS to be "functionally equivalent" to the telephone service available to persons without disabilities. 47 U.S.C. § 225(a)(3).

In support of the argument that the prohibition is contrary to prior FCC positions regarding customer outreach, GoAmerica cites specifically to 47 C.F.R. § 64.604(c)(3), which requires telecommunications carriers to make the public aware of the availability of TRS. Sorenson claims FCC staff recently contacted

-16-

the company asking for help in publicizing the transition to digital television. The 2008 Declaratory Ruling clarified that providers could use customer data "to comply with a federal statute, a Commission rule or order, a court order, or other lawful authority." *2008 Declaratory Ruling*, 23 F.C.C.R. at 8997 (quotation omitted). Consequently, the restriction does not create competing obligations for providers or conflict with prior positions of the FCC. If another order or regulation requires providers to communicate with customers, it prevails. There is no conflict between the new restriction on the use of customer data and other FCC orders and regulations.

GoAmerica also argues the prohibition is contrary to the FCC's prior interpretation of the ADA's functional equivalence mandate. The ADA defines TRS as telephone transmission services that enable persons with disabilities to use the telephone system in a manner "functionally equivalent" to how it is used by persons without disabilities. 47 U.S.C. § 225(a)(3). GoAmerica contends the FCC has interpreted the statutory phrase "functionally equivalent" broadly to require providers to do such things as retain auxiliary power sources for their facilities, handle complaints regarding enforcement issues, allow customers to make TRS calls from public telephones using coins, and provide ten-digit phone numbers for customers. According to GoAmerica, this broad interpretation of functional equivalence demonstrates a requirement that TRS customers enjoy the same relationship with their providers as persons without disabilities. It further

argues this relationship includes the ability to solicit feedback from TRS customers. Additionally, if providers are unable to notify customers of pending changes to TRS being contemplated by the FCC, GoAmerica predicts customers will be less likely to participate in the proceedings, and the FCC will be more likely to take action contrary to the ADA.

The FCC has never interpreted the ADA to require TRS customers to have the same relationship with their telecommunications providers enjoyed by persons without disabilities. By its very nature the TRS customer-provider relationship is different from the traditional telecommunications customer-provider relationship because TRS customers do not pay for the costs associated with the service. 47 U.S.C. § 225(d)(1)(D). The one regulation cited by GoAmerica that even touches upon the customer-provider relationship is the regulation requiring providers to handle complaints from customers. 47 C.F.R. § 64.604(c)(1)-(2), (6). This regulation does not support GoAmerica's position, however, because it does not address functional equivalence. Instead, it implements separate, specific statutory clauses regarding complaints. 47 U.S.C. § 225(e)(2), (g). GoAmerica cites no other regulation to support its position that functional equivalence requires the TRS provider-customer relationship to be identical to the traditional telephone provider-customer relationship. It likewise cites no authority for its argument that a necessary aspect of this relationship is the ability to solicit feedback regarding service. The prohibition on the use of customer data therefore does not

-18-

conflict with prior interpretations of the functional equivalence mandate, and consequently it is not arbitrary or capricious.

GoAmerica also claims functional equivalence may be threatened in the future if it is unable to warn customers in the event the FCC decides to undertake proceedings that would diminish functional equivalence. This argument relies upon a chain of questionable inferences and is purely speculative, as GoAmerica identifies no pending FCC action that threatens functional equivalence. Such speculation does not render the prohibition arbitrary, capricious, or contrary to law.

### 3. Constitutional Challenge

GoAmerica and Sorenson argue the FCC's restriction on the use of customer data is a violation of the First Amendment under *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999). In *U.S. West*, this court considered a challenge to the FCC's regulations regarding the use of consumer proprietary network information ("CPNI") by telecommunications providers. *Id.* at 1228. CPNI was defined as information pertaining to "the quantity, technical configuration, type, destination, and amount of use of a telecommunications service . . . that is made available to the [telecommunications] carrier by the customer solely by virtue of the carrier-customer relationship" as well as information contained in the bills received by customers. *Id.* at 1228 n.1. The FCC prohibited telecommunications providers from using CPNI to market

services to which customers did not already subscribe unless the customer "opted in" and gave affirmative approval to the provider. *Id.* at 1230. This court struck down the restriction as an unconstitutional infringement on commercial speech because the FCC failed to demonstrate its regulations restricted no more speech than necessary to safeguard the asserted state interests in protecting privacy and competition. *Id.* at 1239.

As a threshold matter this court was required to determine whether the regulation affected "speech" at all, since on its face it only regulated the use of data. *Id.* at 1232. This court concluded the regulation did restrict speech because it made the speech between providers and customers more difficult by limiting the ability of providers to target their speech to a particular audience. *Id.* While providers could still conceivably contact the intended audience by indiscriminately broadcasting their speech to a larger audience, the speech was still impaired because the providers' preferred channel of communication was eliminated. *Id.*

Sorenson and GoAmerica argue *U.S. West* is directly on point. They contend the FCC is restricting the ability of providers to use their preferred channel of communication to contact their intended audience. As a result, they claim the restriction must withstand First Amendment scrutiny. The FCC attempts to distinguish *U.S. West* on the grounds that it is not preventing providers from contacting customers directly so long as they do not use

information derived from participation in the government-funded TRS program. The information at issue in this case, the FCC argues, was gathered as a result of participation in a government program. Because the providers only have this information as a result of the service provided to the government, the government may restrict the use of the information. The FCC argues any effect on speech resulting from such a restriction is permissible under *Rust v. Sullivan*, 500 U.S. 173, 193-94 (1991). The FCC does not, however, argue it has a proprietary interest in the customer data.

As in *U.S. West*, the restriction on using customer data to lobby customers affects speech because it limits a preferred channel of communication between the speaker and the intended audience. *U.S. West*, 182 F.3d at 1232. Both commercial and political speech are affected, as the Declaratory Ruling restricts the use of customer data for "lobbying or any other purpose." *2007 Declaratory Ruling*, 22 F.C.C.R. at 20176.

The next question is whether the restriction must withstand the applicable First Amendment tests governing restrictions on political and commercial speech. The FCC does not argue it owns the customer information merely because it funds the TRS provided by petitioners. It instead relies entirely upon *Rust* as authority for its ability to promulgate the restriction. *Rust*, however, is not sufficient support for the government's position. *Rust* concerned the government's ability to restrict the use of funds distributed under a subsidy program. 500 U.S. at 193.

Because it is the government's prerogative to selectively subsidize some activities and not others, the Supreme Court in *Rust* held the government could prevent subsidy recipients from engaging in counseling activities outside a government program's intended scope. *Id.* at 193-94. Here, the government is not directing the use of subsidies, but is instead restricting how providers can use information they collect from customers in the course of providing a federally mandated service. The TRS program, furthermore, is intended to provide a service to persons with disabilities and is not intended to spread a governmental message that would be jeopardized by the providers' use of data to communicate with customers. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-42 (2001). The FCC has not cited to any case applying *Rust* to a restriction on the use of information gathered in the course of providing a government-mandated service, and this court has found none. *Rust*, therefore, does not permit the FCC to evade First Amendment scrutiny in this context. Absent any other authority categorically allowing the FCC to restrict the use of this information, this court analyzes the restriction under the First Amendment tests for restrictions on commercial and political speech.

Restrictions on commercial speech must meet the test set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). If the restriction cannot meet the *Central Hudson* test for commercial speech, it will necessarily be unable to pass the more stringent strict

scrutiny analysis applicable to restrictions on political speech. Under the *Central Hudson* test, three conditions must be met for the restriction to survive: (1) the government must have "a substantial interest in regulating the speech," (2) the regulation must "directly and materially advance[] that interest," and (3) the regulation must be "no more extensive than necessary to serve the interest." *U.S. West*, 182 F.3d at 1233 (quotation omitted). The burden is on the government to prove the restriction on commercial speech is valid under the First Amendment. *Id.*

Here, because it relied exclusively on *Rust* and its assertion it could regulate the use of data solely because it was obtained through participation in a governmentally funded program, the FCC has not attempted to meet its burden under *Central Hudson*. It asserted in the 2008 Declaratory Ruling that the use of customer data to contact customers outside the context of handling calls "is inconsistent with the purpose of the TRS Fund." *2008 Declaratory Ruling*, 23 F.C.C.R. at 8998. Nowhere in the Declaratory Rulings or the FCC's brief to this court, however, does the FCC articulate the governmental interest to be served by the restriction, or why the restriction is narrowly tailored to not restrict more speech than necessary. Under the *Central Hudson* analysis, this court may not "supplant the precise interests put forward by the [government] with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). The FCC's broad prohibition on all uses of customer data belies the notion that the prohibition is

narrowly tailored.  Because the FCC does not explain why the restriction on the use of customer data accords with the First Amendment, the restriction must fail.  Upon remand, the FCC must vacate the restriction on using customer data for "lobbying or any other purpose."

*C. Restriction on Marketing Communications*

Apart from the restrictions on the use of TRS Fund proceeds and customer data, the Declaratory Rulings also prohibit or restrict certain marketing communications between TRS providers and customers.  The 2007 Declaratory Ruling reiterated an existing prohibition on the use of financial and other incentives for consumers to make TRS calls.  *2007 Declaratory Ruling*, 22 F.C.C.R. at 20173-74.   The FCC noted it continued to discover providers were providing improper incentives to customers.  *Id.* at 20175.  These impermissible incentives included "calling a consumer and requiring, requesting, or suggesting that the consumer make VRS calls."  *Id.*  The 2007 Declaratory Ruling prevented providers from using customer data "to in any way attempt to affect or influence, directly or indirectly, their use of relay service."  *Id.* at 20176.  The 2008 Declaratory Ruling clarified that this prohibition applies even when a provider does not use customer data to engage in the communication.  *2008 Declaratory Ruling*, 23 F.C.C.R. at 8998.  GoAmerica argues this language is broad enough to block essentially all marketing to customers, since almost all marketing communications suggest the use of a service or are an attempt to influence

customer behavior.  GoAmerica raises a variety of statutory and constitutional challenges to this restriction on marketing practices.  As a threshold matter, however, this court must address whether GoAmerica adequately preserved its challenge to this provision.

The FCC argues this court should not hear GoAmerica's challenges to the marketing restrictions because GoAmerica did not give the FCC an opportunity to consider the challenges.  Under 47 U.S.C. § 405(a), when "the party seeking [] review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass," a petition for reconsideration is a condition precedent to judicial review.  GoAmerica never filed a petition for reconsideration and, the FCC argues, its arguments were never raised before the FCC by any party.  As a consequence, the FCC asks this court to dismiss GoAmerica's challenges to the restrictions on marketing practices.

The FCC acknowledges the *ex parte* correspondence from Hands On tangentially addresses the lawfulness of the marketing restrictions, but argues the letter contains no more than the "grist" of an argument and was insufficient to give the FCC an opportunity to pass on the legal question at hand.  *See Nw. Ind. Tel. Co. v. F.C.C.*, 824 F.2d 1205, 1210 n.8 (D.C. Cir. 1987); *Alianza Federal de Mercedes v. F.C.C.*, 539 F.2d 732, 739 (D.C. Cir. 1976).  GoAmerica responds that the Hands On *ex parte* letters sufficiently raised all of the arguments it advances on appeal.  It claims the letters gave notice of the legal deficiencies in

the 2007 Declaratory Ruling and it points out that an appellate court may "consider the same basic argument [as raised before the FCC] in a more polished and imaginative form." *Sprint-Nextel Corp. v. F.C.C.*, 524 F.3d 253, 257 (D.C. Cir. 2008) (quotation omitted).

The three *ex parte* letters are substantially similar to each other. They express support for the FCC's regulation of "abusive marketing practices, [including] . . . contacts made by provider representatives urging VRS consumers to make more calls using a provider's service." The only portion of the 2007 Declaratory Ruling they criticize is "the portion . . . which prohibits providers from contacting *for any reason* consumers who have registered with a provider." They then allege the restriction has constitutional, statutory, and policy-based infirmities. The Hands On *ex parte* letters are almost entirely focused upon the restriction on using customer data to contact customers. The one passing reference to the regulation of marketing practices actually *supports* the FCC's position.

Far from giving the FCC an opportunity to pass on its objections to the abusive marketing practices restriction, the letters indicate Hands On *agreed* with the restriction. Because GoAmerica did not file a petition for reconsideration, the failure to raise the basis for its legal challenge prevents GoAmerica from obtaining judicial review. 47 U.S.C. § 405(a). GoAmerica's petition for review of the regulation on abusive marketing practices is therefore dismissed.

**IV. CONCLUSION**

The prohibition on the use of monies from the TRS Fund for lobbying purposes is arbitrary and capricious in violation of the APA because the FCC failed to provide any rationale for why lobbying expenses are the only use of TRS Fund revenues to be specifically prohibited. The prohibition on the use of customer data violates the First Amendment because it impairs commercial and political speech and the FCC has failed to demonstrate why the prohibition is justified under *Central Hudson*. The 2007 and 2008 Declaratory Rulings are hereby **REMANDED** to the FCC for proceedings consistent with this opinion. GoAmerica's challenge to the restrictions on marketing practices is **DISMISSED** because the challenge was not preserved for judicial review.