**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 18, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

SORENSON COMMUNICATIONS, INC.,

    Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

    Respondents.

_____

VERIZON COMMUNICATIONS, INC.;
FRONTIER COMMUNICATIONS
CORPORATION; QWEST CORPORATION,
INC.; T-MOBILE USA, INC.; and CITIZENS
AGAINST GOVERNMENT WASTE,

    Amici Curiae.

Nos. 10-9536 & 10-9560

---

**On Petition for Review From Decision of the**
**Federal Communications Commission**
**(FCC No. CG-03-123)**

---

Christopher J. Wright (Timothy J. Simeone with him on the briefs) of Wiltshire &
Grannis LLP, Washington, DC, for Petitioner.

Joel Marcus, Counsel, Federal Communications Commission (Christine A.
Varney, Assistant Attorney General, Catherine G. O'Sullivan and Robert J.

Wiggers, Attorneys, United States Department of Justice; and Austin C. Schlick, General Counsel, Peter Karanjia, Deputy General Counsel, Richard K. Welch Deputy Associate General Counsel, Federal Communications Commission, with him on the brief) Washington, DC, for Respondents.

Helgi C. Walker of Wiley Rein LLP, Washington, DC, on the briefs for Communications Amici Curiae.

Jessica L. Ellsworth and Uta Oberdoerster of Hogan Lovells US LLP, Washington, DC, on the brief for Amicus Citizens Against Government Waste.

Before **KELLY**, **SEYMOUR** and **HOLMES**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Sorenson Communications, Inc. challenges the 2010-2011 rates set by the Federal Communication Commission ("FCC" or "Commission") to compensate Video Relay Service providers, including Sorenson. We deny the petition for review because the Commission's order is consistent with its statutory mandate and is not arbitrary or capricious.

## I.

Title IV of the Americans with Disabilities Act mandates that individuals with hearing and speech disabilities have access to telecommunications relay services ("TRS"). *See* 47 U.S.C. § 225. TRS enables these individuals to access a telephone system that is "functionally equivalent" to the voice telephone

services used by the general population. *Id.* at § 225(a)(3). That is, just as a hearing person may pick up a phone to place a call, individuals with disabilities may use TRS to communicate with hearing persons over the telephone system. The Federal Communications Commission is responsible for ensuring TRS is "available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals in the United States." *Id.* at § 225(b)(1).

Video Relay Service ("VRS") is a type of TRS, "which enables a person with a hearing disability to remotely communicate with a hearing person by means of a video link and a communications assistant." *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1218 (10th Cir. 2009). Using a broadband internet connection and the video link, the VRS user is able to use sign language with a communications assistant ("CA") who places an outgoing telephone call to a hearing person. "During the call, the CA communicates in American Sign Language . . . with the deaf person and by voice with the hearing person. As a result, the conversation between the deaf and hearing end users flows in near real time." *Structure & Practices of the Video Relay Serv.* (*2010 NPR*), 25 FCC Rcd. 6012, ¶ 3 at 6014 (2010); *see also* 47 C.F.R. § 64.601(a)(26). FCC regulations provide certain minimum standards that VRS providers must meet. Among these requirements, VRS providers must operate every day, twenty-four hours a day,

and must answer 80 percent of all calls within 120 seconds.[1]  47 C.F.R. § 64.604(b)(2)(iii), (4)(i).

TRS customers do not pay to access the service.  Instead, TRS providers are compensated by the TRS Fund at a rate determined by the FCC.  *See* 47 U.S.C. § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii)(E).  "The TRS Fund is financed by interstate telecommunications providers on the basis of interstate end-user telecommunications revenues."  *Sorenson*, 567 F.3d at 1219 (citing 47 C.F.R. § 64.604(c)(5)(iii)(A)).  TRS Fund payments are "designed to compensate TRS providers for *reasonable costs* of providing interstate TRS . . . based on total monthly interstate TRS minutes of use."  47 C.F.R. § 64.604(c)(5)(iii)(E) (emphasis added).  The Commission has defined "reasonable costs" to be "those direct and indirect costs necessary to provide the service consistent with . . . the TRS mandatory minimum standards."  *Telecomms. Relay Servs. & Speech-to-*

---

[1] There are other forms of TRS. *See generally* 47 C.F.R. § 64.601(a).  For example, traditional TRS uses a text telephone ("TTY") to provide service.  The TTY user places a call to the TRS center, and a CA places an outbound voice call from the TRS center to the called party. "The CA serves as the link in the conversation, converting all typed TTY messages from the TTY caller into voice messages, and all voice messages from the called party into typed messages for the TTY user." *Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, (*2000 Order*), 15 FCC 5140, ¶ 2 at 5142 (2000); *see also* 47 C.F.R. § 64.601(a)(22).  IP Relay is another form of TRS that allows users to communicate in text via the internet, rather than by using a TTY and the telephone network.  47 C.F.R. § 64.601(a)(13).  These other forms of TRS have mandatory minimum requirements that differ from those governing VRS.  *See, e.g.*, *id.* §§ 64.604(b), 64.605.

*Speech Servs. for Individuals with Hearing & Speech Disabilities* (*2004 Order*), 19 FCC Rcd. 12475, ¶ 181 at 12543-44 (2004). Sorenson provides the largest percent of VRS minutes and therefore receives a larger reimbursement from the TRS Fund than any other VRS provider.

The TRS Fund is administered by the National Exchange Carrier Association ("NECA"). *Id.* ¶ 8 at 12482. Providers submit their cost data to NECA each year. *See Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities* (*2007 Order*), 22 FCC Rcd. 20140, 20165 n.170 (2007). NECA collects information only on the costs that the FCC has deemed allowable as compensable costs for providing VRS. In a series of prior orders, the FCC designated which costs incurred by VRS providers are allowable and which costs are disallowed from compensation. Allowable costs include, for example, labor costs, directly attributable overhead, startup expenses, executive compensation, and an 11.25% fixed rate of return on investment. *See id.* ¶¶ 49, 74, 76-79 at 20162, 20169-70; *2004 Order*, 19 FCC Rcd. ¶¶ 181-82, 238 at 12544-45, 12566. Disallowed costs include a profit mark-up on expenses, research and development costs for enhancements that exceed mandatory minimum requirements, and the cost of providing videophones, software, and technical assistance to VRS users. *See 2007 Order*, 22 FCC Rcd. ¶ 82 at 20170-71; *2004 Order*, 19 FCC Rcd. ¶¶ 179-81, 189-90 at 12543-44, 12547-48.

Until 2007, the Commission set VRS rates annually, which resulted in

significant variation in compensation each year. *See 2007 Order*, 22 FCC Rcd. ¶¶ 5-6 at 20145. In 2007, the FCC adopted a three-tiered rate structure for compensating VRS providers, with rates that declined as the number of minutes per month increased. *See id.* ¶ 53 at 20163. Under the tiered approach, a provider was compensated at the Tier 1 rate for its first 50,000 minutes of use each month, at the Tier 2 rate for the next 450,000 minutes each month, and at the Tier 3 rate for all minutes above 500,000 each month. *Id.* ¶ 67 at 20167. Under this system, all providers were compensated at the same rate for the same number of minutes each month. *Id.* ¶ 54 at 20163. The rates were set for three years, with a 0.5 percent reduction in reimbursement each year, and were based on the providers' projected costs and minutes of use. *See id.* ¶ 72 at 20168.

The *2007 Order*'s change in compensation was prompted by the Commission's concern that VRS providers had been significantly overcompensated because they received payments greatly exceeding their actual costs. *Id.* ¶ 48 at 20161. The Commission believed tiered compensation would promote competition and ensure that newer providers' costs were covered without overcompensating the more established providers. *Id.* ¶ 53 at 20163.

## II.

In 2010, as the three-year rates from the *2007 Order* were set to expire, the FCC began a broad reexamination of VRS compensation and rates. *See Structure*

-6-

*& Practices of the Video Relay Serv. Program* (*2010 VRS NOI*), 25 FCC Rcd. 8597 (2010). The FCC also adopted an interim, one-year VRS rate plan to be in effect while it considered reforming VRS compensation. *Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities* (*2010 Order*), 25 FCC Rcd. 8689, ¶ 2 at 8690 (2010). Based on the providers' cost data collected by NECA, the Commission again found "a substantial disparity" between the providers' actual costs for providing VRS and the projected costs which had been used to calculate compensation rates. *Id.* ¶ 9 at 8694. The data provided "substantial evidence that providers are receiving far more in compensation than it costs them to provide service." *Id.* ¶ 12 at 8695. The Commission explained that the interim rates were adopted to "balance" the goals of ensuring that VRS providers recovered only the reasonable costs they incur while ensuring quality and sufficient VRS service during the interim period. *Id.* ¶ 2 at 8690.

The 2010-2011 interim rates implemented by the Commission were calculated using two figures: (1) NECA's proposed per-minute rates, based on the actual historical costs providers incurred in providing VRS, and (2) the 2009-2010 rates, which were based on providers' projected costs. *Id.* ¶ 6 at 8692. NECA's suggested rates were significantly lower than the rates established by the

-7-

*2007 Order*.[2]  The Commission found NECA's proposed rates "reasonable and supported by record evidence," *id.* ¶ 13 at 8696, and "that NECA's use of providers' actual, historical costs in proposing VRS rates provides a valuable point of reference for setting VRS rates," *id.* ¶ 9 at 8694.  It expressed concern, however, that the NECA rates would reduce providers' compensation so significantly.  *Id.* ¶ 12 at 8695.  Accordingly, "in light of concerns expressed by providers and users, and to ensure sufficient, quality service for users while the Commission considers broad reform," it declined to adopt the NECA proposed rates.  *Id.* ¶ 6 at 8692-93.  Instead, it averaged those proposed rates with the 2009-2010 fiscal year rates.  *See id.*  The result was an interim rate plan that retained the tiered structure of the *2007 Order*, but reduced rates to $6.24 per minute in Tier 1, $6.23 in Tier 2, and $5.07 in Tier 3.[3]  *Id.* at 8694 tbl.1.

Sorenson asked the FCC to stay the *2010 Order*, but this request was denied.  *See Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals*

---

[2] For the 2009-2010 fiscal year, providers received $6.70 per minute in Tier 1, $6.43 per minute in Tier 2, and $6.24 per minute in Tier 3.  Under NECA's proposal, providers would receive $5.78 per minute in Tier 1, $6.03 in Tier 2, and $3.90 in Tier 3.  *2010 Order*, 25 FCC Rcd. at 8694 tbl.1.

[3] On June 30, 2011, the FCC announced that the 2010-2011 interim VRS rates will continue to be in effect, on an interim basis, until the Commission completes its reevaluation of VRS compensation.  Sorenson supported the extension of the current VRS rates, subject to the outcome of this appeal.  *Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities* (*2011 Order*), FCC No. 11-104, 2011 WL 2596905, ¶¶ 23-24 & n.73 at 10 (June 30, 2011).

*with Hearing & Speech Disabilities* (*2010 Order Denying Stay Motion*), 25 FCC Rcd. 9115 (2010).  Sorenson also sought a stay of the 2010-2011 interim rates from this Court.  We denied the motion, concluding that Sorenson failed to show it was likely to succeed on the merits or that the public would best be served by the issuance of a stay.  We now consider the merits of Sorenson's petition for review.[4]

## III.

We first address Sorenson's contention that the *2010 Order* violates 47 U.S.C. § 225.  We will then turn to its claim that the *2010 Order* is arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

## A.  STATUTORY CLAIMS

By enacting § 225, Congress directed the FCC to ensure the availability of nationwide access to "functionally equivalent" TRS, "to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals in

---

[4] We make permanent the orders entered between October 4 and December 13, 2010, which provisionally sealed the parties' briefs and a portion of the joint appendix.  The submissions will remained sealed.  These materials were filed under seal to protect confidential information relating to Sorenson's finances and business practices.  In this opinion, we do not divulge any information that was treated as confidential by the parties, unless it was previously publicly disclosed by the FCC.

the United States." 47 U.S.C. § 225(a)(3), (b)(1).[5] The FCC was also directed to ensure its regulations "encourage . . . the use of existing technology and do not discourage or impair the development of improved technology." *Id.* § 225(d)(2). Sorenson asserts the reimbursement rates set by the FCC's *2010 Order* are so low that the result violates each of these statutory requirements.

Where, as here, Congress has delegated lawmaking authority to an agency, "we review the agency's statutory interpretation promulgated in the exercise of that authority under the two steps set out in *Chevron U.S.A. v. NRDC*, 467 U.S. 837 (1984)." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1199 (10th Cir. 2001) (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001)). If the statute is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. 842-43. If the statute is silent or ambiguous, we must apply the agency's interpretation if it "is based on a permissible construction of the statute." *Id.* at 843.

## 1. *Functionally Equivalent*

Sorenson claims the interim VRS rates violate § 225's goal of providing access to "functionally equivalent" service to the hearing and speech impaired. According to Sorenson, the increased wait times that may result from the lower

---

[5] As part of the Commission's duties under this statute, Congress directed it to enact regulations that established functional requirements for TRS and set minimum standards for TRS providers. *See* 47 U.S.C. § 225(d)(1)(A)-(B).

rates will compromise the functional equivalence required of VRS. Of course, that all depends on what Congress meant by "functionally equivalent."

Section 225 does not define "functionally equivalent" and therefore leaves the definition to the FCC. *See Chevron*, 467 U.S. at 843-44; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("[A]mbiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in a reasonable fashion."). Consistent with this authority, the FCC has determined that "functional equivalency is met when the service complies with the mandatory minimum standards applicable to the specific service." *2004 Order*, 19 FCC Rcd. ¶ 189 at 12548. In adopting this approach, the Commission explained it was ensuring that the TRS Fund would not become "an unbounded source of funding for enhancements that go beyond these standards, but which a particular provider nevertheless wishes to adopt." *Id.*

The FCC recognizes that the speed at which a VRS user is able to reach a CA and place a call is a fundamental component of ensuring functional equivalence. *See, e.g.*, *Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities* (*2005 Order*), 20 FCC Rcd. 13165, ¶ 17 at 13174 (2005). In this spirit, and consistent with its statutory mandate to establish the functional requirements for TRS, *see* 47 U.S.C. § 225(d)(1)(A), the FCC established mandatory minimums for VRS service which

-11-

are unchallenged in this appeal. This regulation requires VRS providers to "answer 80% of all calls within 120 seconds." 47 C.F.R. § 64.604(b)(2)(iii).

Notably, Sorenson does not claim that it will be unable to satisfy the mandatory 80/120 speed-of-answer requirement under the interim rates. Instead, it only claims that its average wait times may increase from ten seconds to twenty seconds. *See 2010 Order Denying Stay Motion*, 25 FCC Rcd. ¶ 12 at 9118. Even under Sorenson's doomsday scenario, its increased wait times fall well-below the 120-second threshold set by the FCC for functional equivalence. Sorenson has failed to show the FCC's interpretation of "functionally equivalent" is impermissible under the statute. Consequently, it has not established that the interim rates violate the functional equivalence requirement of § 225.

## 2. Availability Mandate

Sorenson also contends the *2010 Order* violates the statute's requirement that TRS be "available, to the extent possible" to hearing and speech impaired individuals in the United States. 47 U.S.C. § 225(b)(1). Sorenson argues the *2010 Order* violates this availability mandate because the lower interim rates will undermine its ability to serve its current users and will prevent additional training and outreach to extend VRS to even more hearing and speech impaired individuals. We are not persuaded.

Sorenson exaggerates the impact of the FCC's temporary rate reduction and fails to undermine the Commission's determination that service availability will

remain adequate during the interim period. In the *2010 Order*, the Commission

justified its departure from NECA's proposed rates by emphasizing its goal of

"ensur[ing] sufficient, quality service for users while the Commission considers

broad [rate] reform." *2010 Order*, 25 FCC Rcd. ¶ 6 at 8693. While Sorenson

asserts its wait times for service could possibly double under the interim VRS

rates, it does not claim that it will be unable to meet the mandatory minimum

requirements for VRS, including answering 80 percent of calls within 120

seconds. *See* 47 C.F.R. § 64.604(b)(2)(iii). More importantly, Sorenson does not

contend that under the interim VRS rates it, or any other provider, will be unable

to serve any customer who requests service. As a result, Sorenson has not shown

that the "availability" of VRS will be impaired by the interim rates.

Nor does the availability mandate require anything more. Despite

Sorenson's suggestions to the contrary, the mandate does not entitle Sorenson to

compensation for whatever VRS-related service it would like to provide to its

current or potential customers. Instead, the FCC has sensibly adopted an

approach that compensates only the reasonable costs of providing access to VRS,

by limiting compensation to certain "allowable costs." *See 2010 Order*, 25 FCC

Rcd. ¶ 10 at 8694 ("We are therefore compelled . . . to ensure that providers

recover only the reasonable costs caused by their provision of VRS."); *2004*

*Order*, 19 FCC Rcd. ¶ 181 at 12543-44 ("[W]e believe 'reasonable costs' must be

construed to be those direct and indirect costs necessary to provide the service

-13-

consistent with all applicable regulations . . . *i.e.*, the TRS mandatory minimum standards."). Certainly if the FCC were to offer VRS providers an unlimited amount of money, then more interpreters could be hired and more videophones could be given away for free; in turn, it is possible that more users would adopt VRS and wait times would improve. But it is folly to suggest that § 225 requires VRS to operate at any cost or entitles VRS providers to unlimited compensation. *See 2004 Order*, 19 FCC Rcd. ¶ 197 at 12551. Instead, the statute requires VRS to be made "available, to the extent possible and in the most efficient manner," to the individuals who would benefit from it. 47 U.S.C. § 225(b)(1).

Significantly, the categories of compensable expenses were not changed by the *2010 Order*. *See 2010 Order*, 25 FCC Rcd. ¶ 15 at 8697. Thus, even though Sorenson worries that "outreach and training" will be sacrificed under the interim rates, such costs were not compensated under earlier rate plans. In a series of unchallenged orders, the FCC excluded from reimbursement a number of expenses, including the cost of the video equipment that some providers chose to provide free to their users. *See, e.g.*, *2007 Order*, 22 FCC Rcd. ¶ 82 at 20170-71. In any event, the suggestion that the statute is violated by Sorenson's inability to provide free phones to new users has no merit. The statute only requires that VRS be made "available" and that users pay no higher rates for calls than others pay for traditional phone services. *See* 47 U.S.C. § 225(d)(1)(D). It does not also require that VRS users receive free equipment and training.

-14-

*3. Efficiency Mandate*

Third, Sorenson claims the interim VRS rates undermine § 225's requirement that TRS operate in an "efficient manner." *See id.* Specifically, Sorenson complains that the Commission misinterprets the word "efficient" by emphasizing how much money from the TRS Fund is spent on VRS, rather than encouraging VRS providers to lower their own costs and operate in a more efficient manner. The Commission urges us not to consider this argument because Sorenson did not give it an opportunity to consider the issue in the administrative process.

The filing of a reconsideration petition to the Commission is "a condition precedent to judicial review . . . where the party seeking such review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass." 47 U.S.C. § 405(a). Sorenson did not file a petition for reconsideration, so we must determine whether the FCC was otherwise given an opportunity to pass on the issue.

Sorenson did raise concerns to the Commission that tiered rates discourage providers from operating efficiently by rewarding smaller, inefficient providers with higher rates. In its comments to the Commission, however, Sorenson never made the argument it makes here: that the FCC's focus on the amount paid to providers from the TRS Fund is an unreasonable construction of § 225's efficiency mandate. Although "an appellate court may 'consider the same basic

-15-

argument [as raised before the FCC] in a more polished and imaginative form,'"

*Sorenson*, 567 F.3d at 1227 (quoting *Sprint-Nextel Corp. v. FCC*, 524 F.3d 253, 257 (D.C. Cir. 2008)) (alteration in original), Sorenson's "basic" argument was not raised before the FCC.  As a result, Sorenson has not preserved this argument for judicial review.

4.  *Development of New Technology*

Sorenson's final statutory argument is that the interim rates undermine § 225's goal of "not discourag[ing] or impair[ing] the development of improved technology."  47 U.S.C. § 225(d)(2).  Sorenson claims the interim rates violate this provision because they do not compensate providers for the cost of customer equipment, such as videophones, which discourages the deployment of new technology.  Again, Sorenson's argument fails to persuade us.

As we have already discussed, providing free customer equipment was not an allowable cost for compensation from the TRS Fund even under earlier Orders. *See, e.g.*, *2007 Order*, 22 FCC Rcd. ¶ 82 at 20170 ("Because some providers appear to continue the practice of giving video equipment to consumers and installing it at no cost to the consumer, we also reiterate that [these] costs . . . are not compensable from the Fund."); *Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing and Speech Disabilities* (*2006 Order*), 21 FCC Rcd. 8063, ¶ 17 at 8071 (2006) ("Compensable expenses . . . do not include expenses for customer premises equipment . . . or installation of the equipment or

any necessary software."). Instead, the FCC has determined that the cost of videophones supplied to customers is not a recoverable expense because "compensable expenses must be *the providers'* expenses in making the service available and not the customer's costs of receiving the service." *2006 Order*, 21 FCC Rcd. ¶ 17 at 8071.

Such disallowances do not violate the statute. Just as users of traditional telephone service do not receive their telephones for free, § 225 does not require that VRS users receive free videophones. Instead, the statute only mandates that TRS users "pay rates no greater than the rates paid" for voice telephone service "with respect to such factors as the duration of the call, the time of day, and the distance" of the call. 47 U.S.C. § 225(d)(1)(D). Notably, some VRS providers do not provide free phones to their users, and users must pay for their own broadband internet connections in order to use VRS. Sorenson of course may provide free phones to its VRS users, but nothing in the statute requires it to be compensated for that expense. The *2010 Order* does not violate § 225 by its refusal to treat such expenses as "reasonable" costs of providing VRS.

Despite Sorenson's claims to the contrary, the interim VRS rates adopted by the FCC in the *2010 Order* are consistent with Congress's mandate under 47 U.S.C. § 225. The FCC has discretion to balance the objectives of § 225 when they conflict, and the interim rates reflect a reasonable balance of these competing objectives. *Cf. Qwest*, 258 F.3d at 1200 (noting Commission's

-17-

"discretion to balance the principles in [§ 254(b)] against one another when they conflict"); *Rural Cellular Assoc. v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) (similar).

## B. APA CLAIMS

Sorenson also claims the *2010 Order* is arbitrary and capricious in violation of the Administrative Procedure Act. First, it argues the ratemaking method was irrational because NECA's proposed rates are unreliable and were nevertheless averaged by the Commission with the prior rates. Second, it contends the tiered structure is irrational.

Under the APA, we review the FCC's *2010 Order* to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see also Qwest*, 258 F.3d at 1198. To comply with the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise.

*Id.* "An agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious." *Sorenson*, 567 F.3d at 1221.

We are particularly deferential when reviewing ratemaking orders because "agency ratemaking is far from an exact science and involves policy determinations in which the agency is acknowledged to have expertise." *Qwest*, 258 F.3d at 1206 (quoting *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999)) (internal quotation marks omitted). Moreover, the FCC is entitled to substantial deference when adopting interim rates.[6] *See, e.g.*, *Rural Cellular*, 588 F.3d at 1105 ("This court has . . . acknowledged the FCC should be given 'substantial deference' when acting to impose interim regulations."); *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 616 (5th Cir. 2000) ("Because the

---

[6] Sorenson disputes the FCC's characterization of the rates as "interim." As it points out, the Commission set VRS rates annually prior to 2007. *See 2010 Order*, 25 FCC Rcd. at 8693 n.28; *2007 Order*, 22 FCC Rcd. ¶¶ 5-6 at 20144-45. In Sorenson's view, the FCC's decision to set a one-year rate once again for 2010-2011 is insufficient to warrant the increased deference that accompanies interim rates. We disagree. The Commission made clear in the *2010 Order* its intention that the new rates be temporary while it totally reevaluates VRS compensation. *See 2010 Order*, 25 FCC Rcd. ¶ 12 at 8695 ("We intend to consider fully in a separate public proceeding . . . the most appropriate way to calculate and set future rates. In the meantime, however, we decline to perpetuate the large discrepancy between actual costs and provider compensation . . . ."). That review process is currently underway. *See 2011 Order*, FCC No. 11-104 ¶¶ 5-7 at 3-4. We therefore extend the deference owed to the FCC when it engages in interim ratemaking.

provisions under review are merely transitional, our review is especially deferential.").

*1. NECA Data*

Sorenson raises two arguments in challenging the "methodology" used by the FCC to develop the interim rates. Its first argument focuses on the use of NECA's proposed rates in the rate calculation. In its view, NECA's proposed rates are badly flawed because they do not reflect Sorenson's actual costs of providing services, which Sorenson deems to include the videophones and technical assistance it provides at no charge to its users, as well as its tax and debt service payments. Sorenson claims the FCC's reliance on NECA's rates was arbitrary and capricious because the Commission failed to explain why these additional costs are excluded from compensation and ignored the actual costs Sorenson incurs to provide VRS.

The FCC explained in its *2010 Order* that it is seeking comment on and reevaluating categories of compensable costs during this interim period. *See 2010 Order*, 25 FCC Rcd. ¶ 7 at 8693. In the meantime, however, it "sought to find a reasonable balance between the past rates based on projections that consistently overstate true costs and overcompensate VRS providers, and the NECA-proposed rates based on actual costs . . . ." *Id.* ¶ 12 at 8695. Furthermore, as the Commission explained, the categories of compensable costs in NECA's proposed rates are the same categories that were compensable when the agency reimbursed

on the basis of providers' projected costs. *Id.* ¶ 15 at 8697. The Commission has been consistent in its view that providers may only recover the reasonable costs of providing a level of service that complies with the minimum standards for VRS. *See id*. ¶ 10 at 8694; *2004 Order*, 19 FCC Rcd. ¶ 181 at 12543-44. Particularly given this consistent position on allowable costs, the Commission provided a sufficient explanation for declining to change the categories of allowed costs during the interim period.

Moreover, although Sorenson complains generally that NECA's proposed rates are too low, it offers no reason to question the accuracy of NECA's computation of the allowable costs incurred by VRS providers. Nor does it undermine the FCC's determination that NECA's proposed rates were "reasonable and supported by the record evidence," *2010 Order*, 25 FCC Rcd. ¶ 13 at 8696. As a result, Sorenson has failed to show that reliance on NECA's proposed rates was arbitrary and capricious.[7]

---

[7] Sorenson claims the Commission failed to reference or respond to the audited report of its actual costs that it submitted. Although the Commission did not address the specific figures submitted in the audited report, this is not surprising. The Commission has a policy, urged by VRS providers including Sorenson, of keeping providers' submitted cost data confidential. *See 2007 Order*, 22 FCC Rcd. ¶ 88 at 20173; *cf.* 47 C.F.R. § 64.604(c)(5)(iii)(I) (requiring NECA to keep data obtained from providers confidential). Sorenson submitted its audit report with a request that it be treated confidentially. It is therefore reasonable that the Commission did not directly respond to Sorenson's claimed actual costs for providing VRS. The Commission did, however, address providers' general comments claiming that NECA's data did not include all of the
(continued...)

Sorenson contends NECA's rates are irrational for an additional reason. Under NECA's proposed rates, providers are given a working capital allowance of 1.6%, which is paid on a rolling basis every thirty days. But each reimbursement is made approximately sixty-five days after the specific cost submission. This delay, Sorenson claims, renders NECA's rates unreasonable because the allowance assumes a repayment schedule that is not actually implemented. In the *2010 Order*, the Commission explained that because the working capital allowance is paid monthly on a per-minute basis, "it does not substantially matter whether the lag time from a specific cost submission is thirty days or sixty-five days." *Id.* at 8692 n.23. Sorenson asserts that the Commission's explanation is unreasonable, but offers no support for its claim that VRS providers are negatively affected by the delay. Merely asserting that the Commission's actions are unreasonable does not make it so.

Sorenson's second challenge to the Commission's ratemaking methodology addresses the Commission's decision to average NECA's proposed rates with the 2009-2010 reimbursement rates. Sorenson claims that by averaging the two rates, the Commission acted arbitrarily and capriciously because the 2009-2010 rates

[7](...continued)
true costs of providing VRS. *See 2010 Order*, 25 FCC Rcd. ¶¶ 11, 15 at 8685, 8697. Because the Commission reviewed the relevant data and provided a satisfactory explanation of its action, this was sufficient. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

were the result of a price cap regime, while NECA's proposed rates were based on some providers' historical costs. In Sorenson's view, it was irrational to average these two "fundamentally different" ways of calculating the costs of VRS. Aplt. Br. at 49.

We are not convinced the 2009-2010 rates and the NECA proposed rates are as fundamentally different as Sorenson would like us to believe. Both were efforts to calculate the actual costs of providing VRS services, and both treated the same categories of costs as reimbursable. *See 2010 Order*, 25 FCC Rcd. ¶ 15 at 8697. The Commission readily admits rates in the *2007 Order* were based on providers' projected costs, while NECA's rates are based on providers' historical costs. *Id.* ¶ 6 at 8692; *2007 Order*, 22 FCC Rcd. ¶ 47 at 20160-61. But this is insufficient to render the interim rates arbitrary and capricious. "As long as the Commission makes a reasonable selection from the available alternatives, its selection of [ratemaking] methods will be upheld even if the court thinks that a different decision would have been more reasonable or desirable." *Sw. Bell Tel. Co.*, 168 F.3d at 1352 (alteration and internal quotation marks omitted).

In light of our determination that the Commission provided adequate justification for its reliance on NECA's proposed rates, we are similarly unpersuaded by Sorenson's argument regarding the FCC's method of averaging NECA's proposed rates with the previous rates. Contrary to Sorenson's claims, the Commission provided a satisfactory explanation for why it chose the midpoint

between NECA's proposed rates and the prior rates. It explained that earlier compensation levels had resulted in significant overcompensation for VRS providers. *See 2010 Order*, 25 FCC Rcd. ¶¶ 9, 20 at 8694, 8698. As a result of this overcompensation, it could "no longer justify basing VRS compensation rates only on projected costs." *Id.* ¶ 10 at 8695. While the Commission found NECA's proposed rates "reasonable and supported by record evidence," *id.* ¶ 13 at 8696, it was concerned that adopting NECA's rates would cause a "significant and sudden cut to providers' compensation." *Id.* ¶ 12 at 8695. In an effort to ameliorate that problem, the Commission "sought to find a reasonable balance" between past rates that overcompensated providers and NECA's rates, so it selected the midpoint between the two. *Id.*

Courts have previously upheld ratemaking methodologies that relied on the average or midpoint of two sets of numbers. *See, e.g.*, *Am. Pub. Commc'ns Council v. FCC*, 215 F.3d 51, 58 (D.C. Cir. 2000) (holding that where it was reasonable to rely on figures used, the use of midpoint between two figures was not arbitrary); *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1010-11 (D.C. Cir. 2005) (finding use of midpoint consistent with agency's rationale and not arbitrary and capricious). Given the Commission's dual purposes of moving reimbursement rates closer to actual costs while avoiding a too onerous cut to providers, we hold it was reasonable to use the midpoint between the existing

rates and the actual costs NECA determined.[8]  Averaging the two rates is certainly

not the only method the Commission could have employed.  But the Commission

provided a sufficient explanation for the action it chose.  Under our deferential

review, that is all that is required.  *See Sw. Bell Tel. Co.*, 168 F.3d at 1352.

## 2.  *Tiered-Rate Structure*

Sorenson also challenges the FCC's decision to retain a three-tiered rate

structure in the interim period.  The Commission explained that NECA's data

supported its conclusion that the tiered structure was a "workable, reliable way to

account for the different costs incurred by carriers based on their size and volume

of TRS minutes relayed."  *2010 Order*, 25 FCC Rcd. ¶ 17 at 8697.  It also found

that the rationale set forth in its *2007 Order* for adopting a tiered structure

remained applicable because smaller providers generally have higher costs than

larger providers.  It finally noted there was a lack of evidence supporting

departure from the existing tiered rate structure, but explained it was continuing

to reevaluate the use of tiered rates during the interim period.  *Id.*

Sorenson first challenges the evidence supporting the tiered rate structure.

It reasserts its criticisms of the NECA data, which we have already addressed.  In

---

[8] Sorenson also contends the rates adopted by the Commission were
arbitrary and capricious because, it says, the Commission falsely stated that the
Tier 3 rate fell within the range of rates proposed by providers.  The Commission
asserts this issue was not previously raised and therefore cannot be considered on
appeal.  Sorenson does not refute the Commission's assertion, and we therefore
do not consider Sorenson's argument.  *See* 47 U.S.C. § 405(a).

addition, Sorenson contends NECA's proposed rates actually undermine the rationale behind the tiered rate structure because NECA concluded that Tier 1 minutes cost less than Tier 2 minutes. It also claims the FCC ignored Sorenson's evidence that economies of scale are inapplicable to VRS.

Despite Sorenson's contention that a tiered rate structure is inappropriate for VRS, the Commission had ample evidence to support its conclusion to the contrary. NECA's data showed a substantial disparity between the costs incurred by Tier 1 and 2 providers and Tier 3 providers. *See id.* at 8694 tbl.1. This data comports with the FCC's finding that "[t]he rationale for adopting the tiers in the *2007 TRS Rate Methodology Order* remains applicable; that is, providers with a relatively small number of minutes generally have higher costs." *Id.* ¶ 17 at 8697.

Moreover, although a number of commenters recommended restructuring the tiers in various fashions, Sorenson was the only provider to challenge the tier structure itself. *See id.* ¶ 16 at 8697; *see also 2010 Order Denying Stay Motion*, 25 FCC Rcd. ¶ 15 at 9119-20. The Commission considered the comments Sorenson submitted. *See 2010 Order*, 25 FCC Rcd. at 8691 n.17 (listing among the comments received by the Commission "Sorenson Reply Comments (May 21, 2010)).

Even Sorenson's own evidence fails to contradict the Commission's determination that "providers with a relatively small number of minutes generally have higher costs" than providers with a large number of minutes, *id.* ¶ 17 at

8697-98. Instead, Sorenson simply disputes the reason for the cost disparities. In Sorenson's view, its costs are lower because it is more efficient than other VRS providers, not necessarily because economies of scale allow it to operate at lower costs. Given NECA's data and the comments from various providers seeking to retain some type of tiered rate structure, however, there is sufficient evidence in the record to support the FCC's determination that tiered rates continue to be workable and reliable during the interim period. The FCC's explanation for maintaining the tiered rate structure is sufficient.

We easily dispense with Sorenson's two final challenges to the tiered structure. It claims the tiered rates are arbitrary and capricious because they compensate Sorenson differently than other providers. We agree with the Commission that this misrepresents the tiered rate structure. That structure actually treats all providers equally. They all receive the Tier 1 rate for their first 50,000 minutes per month, the Tier 2 rate for the next 450,000 minutes per month, and the Tier 3 rate for all minutes above 500,000. *See 2007 Order*, 22 FCC Rcd. ¶ 54 at 20163 ("[U]nder the tiered approach, all providers would be compensated on a 'cascading' basis, such that providers would be compensated at the same rate for the minutes falling within a specific tier."). That the bulk of Sorenson's minutes fall within Tier 3 does not mean Sorenson is treated differently than other providers.

Sorenson also argues that if it is able to provide service at a lower rate than

other providers, it is unreasonable for the FCC to choose to pay other providers more. However, the tiered rates are consistent with the Commission's stated goal of ensuring that providers' compensation becomes more closely aligned with their actual costs. *See 2010 Order*, 25 FCC Rcd. ¶ 6 at 8692-93. For smaller providers with higher relative costs, compensation in Tiers 1 and 2 more closely aligns with their costs of providing services. For a large provider like Sorenson, which has lower average costs, the Tier 3 rate helps to ensure Sorenson is not overcompensated for providing VRS. Sorenson's argument on this point is without merit.

Having examined the relevant data and articulated a reasoned explanation for its interim rates, the Commission's order is not arbitrary or capricious.

## IV.

Because the *2010 Order*'s interim rate plan for VRS neither violates 47 U.S.C. § 225 nor is an arbitrary and capricious exercise of the FCC's authority, we **DENY** Sorenson's petition for review.